IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION


CHARLES BROOKS, JR.                                                      PLAINTIFF

VS.                                          CIVIL ACTION NO.  2:04CV120KS-MTP

RICHARD STRINGER, SHERIFF OF MARION
COUNTY, JOE MINGO, WARDEN OF MARION-
WALTHALL CORRECTIONAL FACILITY, MARILYN
PAYNE, INDIVIDUALLY AND IN THEIR OFFICIAL
CAPACITIES                                                               DEFENDANTS


**MEMORANDUM OPINION AND ORDER**

This matter is before the court on a motion for summary judgment filed by defendants.  In a related motion, defendants have moved to strike certain affidavits submitted by plaintiff in opposition to the motion for summary judgment.  From its review of all matters made a part of the record as well as the motions and responses and applicable law, and thus being fully advised in the premises, the court finds that defendants' motion to strike should be granted in part and denied in part, and defendants' motion for summary judgment should be granted.  The court specifically finds as follow:

FACTUAL BACKGROUND

Plaintiff filed the instant lawsuit on March 25, 2004, alleging that on March 28, 2003, while he was an inmate at the Marion-Walthall Correctional Facility ("Marion-Walthall"), he was beaten by another inmate and that as a result, he was permanently partially paralyzed. Plaintiff asserts claims against defendants in their individual and official capacities under federal

1

and state law.  A more detailed discussion of the facts will be set forth below in the Analysis section.

On December 15, 2006, defendants moved for summary judgment.  At that time, defendants also moved to strike (on the grounds of violations of discovery rules, as well as hearsay and other evidentiary objections) four affidavits produced to them by plaintiff that they anticipated plaintiff would be submitting in opposition to their motion for summary judgment.  The court struck one affidavit, declined to strike the others, and deferred ruling on defendants' hearsay and other evidentiary objections to the affidavits until and unless they were submitted by plaintiff in opposition to the motion for summary judgment.[1]  On January 12, 2007, plaintiff responded to the motion for summary judgment and submitted these affidavits, along with several others, including one from plaintiff.  On January 24, 2007, defendants filed a second motion to strike the affidavits.[2]

---

[1] The court struck the December 4, 2006 affidavit of Anthony Jackson, and declined to strike the December 5, 2006 affidavit of Louis McClendon and the October 12, 2006 and December 2, 2006 affidavits of Samuel Raiford.  On January 7, 2007, plaintiff moved to reconsider the court's order striking the Jackson affidavit.  The court had not yet ruled on that motion when plaintiff responded to the motion for summary judgment on January 12 and submitted the Jackson affidavit in support thereof.   The court hereby denies the motion for reconsideration [ **# 130**] and, therefore, this affidavit will not be considered in opposition to the motion for summary judgment.  At any rate, even if it were considered by the court, the vast majority of the Jackson affidavit would be stricken as conclusory, lacking personal knowledge or hearsay.

[2] In response to defendants' second motion to strike, plaintiff submitted a 236-page document consisting of a random assortment of gibberish, case law, and correspondence previously exchanged between the parties regarding discovery.  In addition, within this document there are numerous references to parties not involved in the instant lawsuit.  It is unclear how this document responds to the second motion to strike.  At any rate, Rule 7.2(E) of the Uniform Local Rules provides that "respondent's memorandum shall not exceed thirty-five pages."   Defendants have moved to strike plaintiff's response pursuant to this rule and the court finds that the motion is well-taken and should be granted.  However, the court will consider the arguments made in the

STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrates the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir. 1988).  The moving party, however, need not negate the elements of the non-movant's case.  *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) *(citing Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to show with "'significant probative' evidence" that a genuine issue of material fact actually exists.  *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994) (citation omitted).  To overcome summary judgment, the non-movant may not rest on the pleadings, but must identify specific evidence in the ... record demonstrating that there is a material fact issue concerning the essential elements of its case."  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (citation omitted); *see also Celotex*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 257.  "The moving party need not support its motion with affidavits or other evidence, but to defeat a

---

original motion to strike and plaintiff's response to the original motion to strike in ruling on the second motion to strike.

motion for summary judgment the nonmovant must present evidence sufficient to establish the existence of each element of his claim as to which he will have the burden of proof at trial." *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 565 (5th Cir. 1996) (citation omitted). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence...will be insufficient" to defeat a properly supported motion for summary judgment.). "[C]onclusory allegations, speculation and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Douglass*, 79 F.3d at 1429 (citation omitted). The non-movant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

When deciding a motion for summary judgment, the evidence submitted by the nonmoving party is presumed valid, and all reasonable inferences that may be drawn from that evidence must be drawn in favor of the party opposing summary judgment. *Anderson*, 477 U.S. at 255. The district court, therefore, "must not resolve factual disputes by weighing conflicting evidence, ... since it is the province of the jury to assess the probative value of the evidence." *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980) (internal citation omitted). Summary judgment is improper where the court merely believes it unlikely that the nonmovant will prevail at trial. *Nat'l Screen Serv. Corp. v. Poster Exch., Inc.*, 305 F.2d 647, 651 (5th Cir. 1962). By contrast, summary judgment for the moving party is only proper when a rational factfinder, looking at the record as a whole, could not find for the nonmoving party. *Matsushita*, 475 U.S. at 587.

Documentary evidence which is not admissible at trial is not admissible during the summary judgment phase of litigation.  *Salas v. Carpenter*, 980 F.2d 299, 305 (5ᵗʰ Cir. 1992). Rule 56(e) of the Federal Rules of Civil Procedure provides that affidavits submitted in support of and in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Those portions of an affidavit that do not comply with Rule 56(e) should not be given weight or considered in deciding a motion for summary judgment.  *Richardson v. Oldham*, 12 F.3d 1373, 1378-79 (5ᵗʰ Cir. 1994); *see also Lester v. Rosedale*, 757 F.Supp. 741, 744 n.10 (N.D. Miss. 1991).[3]

<u>ANALYSIS</u>

Because the court's disposition of the second motion to strike is intertwined with its disposition of the motion for summary judgment, they will both be addressed together below.

Plaintiff, Charles Brooks, was detained at the Marion-Walthall Correctional Facility ("Marion-Walthall") on three separate occasions between May 2001 and May 2003 on a grand jury indictment for felony murder and on charges of a possession of a firearm by a convicted felon brought against him by the city of Columbia, Mississippi.[4]  According to plaintiff, in May

---

[3] The Fifth Circuit has indicated that under Rule 56(e), the non-movant's affidavits should not be held to as strict a standard as those of the moving party.  *Richardson v. Oldham*, 12 F.3d 1373, 1378 (5ᵗʰ Cir. 1994); *see also Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5ᵗʰ Cir. 1987) ("[T]he papers of a party opposing summary judgment are usually held to a less exacting standard than those of the moving party.... In previous cases we have accepted evidence from the party opposing summary judgment despite its failure to meet the technical requirements of Rule 56(e).") (citations omitted).

[4] Due to orders from the Circuit Court relating to his charges and posting of bond(s), plaintiff was released from and readmitted to Marion-Walthall several times.  On March 3, 2003, plaintiff entered Marion-Walthall for the third and final time.

2001 he was threatened with death at a bond hearing in open court by the mother of the man - Edward Collins - that he had shot.[5]  Plaintiff avers that he is not a member of any gang. According to plaintiff, as well as to his nephew, Samuel Raiford, who also was an inmate at Marion-Walthall with plaintiff and who submitted an affidavit in opposition to the motion for summary judgment, Mr. Collins was a member of the Vicelord gang.  Defendants have moved to strike these statements on the ground that the affiants lack personal knowledge and are simply making conclusory statements.  However, Mr. Brooks' affidavit states that it is made on personal knowledge.  Although Mr. Raiford does not make such a statement in his October 12, 2006 affidavit, in his December 2, 2006 affidavit he states that he has personal knowledge and he indicates that he has seen fellow inmates with gang tattoos in the Zone, and that Vicelords wear their hats to the left and Gangsters wear their hats to the right.   Therefore, in light of the less exacting standard applied to these affidavits opposing summary judgment, and in light of the fact that this court finds it reasonable to infer that these two affiants would have personal knowledge of, and familiarity with, gang symbols and gang affiliations of fellow inmates, defendants' motion to strike these statements is denied.

On all three occasions when plaintiff was incarcerated at Marion-Walthall, he was housed on the county side and was always in an isolation or protective custody/lockdown cell, except for the few times he was out of lockdown and was housed in the general pre-trial detainee zone (the "Zone"), discussed below.   Defendants have testified that this placement in lockdown was mandatory and was made pursuant to standard county procedure for incoming detainees charged

---

[5]  In addition, according to Mr. Raiford, the day plaintiff arrived at Marion-Walthall he heard inmates say that plaintiff "was the guy who shot the guy who had gone with my cousin." This statement is clearly hearsay and will not be considered by the court.

with serious crimes such as felony murder.  Plaintiff testified that he never requested to be put in lockdown but was simply placed there by defendants.

According to plaintiff, each of the three times he was at Marion-Walthall, alleged murderers were in the Zone and were not in lockdown - for example, Draper Kelly,[6] Anthony "Ant" Jackson and Cory Alexander.  Plaintiff avers that Mr. Kelly was a member of the 4Corner Hustlers, a gang related to or affiliated with the Vicelords.  According to Mr. Raiford,  Draper Kelly was a member of the Vicelords.  For the reasons discussed above, defendants' motion to strike these statements will be denied.

During his first period of incarceration, plaintiff was attacked by Mr. Kelly while in the Zone.  According to plaintiff, he had been in the Zone for a day or two because Sergeant Taylor had let him out of lockdown, saying that he had "been back there long enough."  Plaintiff testified that he did not ask to be let out of lockdown.  After the attack by Mr. Kelly, plaintiff was placed in lockdown where he stayed until he was released on bond, while Mr. Kelly remained in the Zone.[7]  On another occasion during this first period of incarceration, plaintiff was being

---

[6]  Plaintiff avers in his affidavit that Mr. Kelly told him that his cousin was Mr. Collins, the man plaintiff shot.  This statement is clearly inadmissible hearsay and will not be considered by the court in opposing the motion for summary judgment.

[7]  In paragraph 6 of his affidavit (not paragraph 4, as erroneously cited by defendants in their motion to strike), plaintiff asserted that "an assistant warden, whose name plaintiff does not recall, wanted to put plaintiff, not Kelly in the Zone.  However, plaintiff told the assistant warden that he did not want to go back in the Zone because there were gang members there. He wanted to go back to protective custody."   Defendants have moved to strike this statement.  The first sentence seeks to state the desires or state of mind of another individual, of which plaintiff is not competent to testify and which would, at any rate, be inadmissible hearsay.  Therefore, the court will disregard this sentence.  In addition, the next two sentences (regarding plaintiff's alleged desire to go back to protective custody) contradict, without explanation, plaintiff's prior, repeated sworn testimony that he never requested to be put in protective custody, and they cannot create a genuine issue of material fact to defeat summary judgment.  Accordingly, the court will disregard

returned from court in handcuffs and shackles, and Mr. Kelly was also coming back from court but he was wearing only shackles.  As they were being released to go back into the Zone, Mr. Kelly's shackles and plaintiff's handcuffs had been removed.  Mr. Kelly and plaintiff then had another altercation.  Plaintiff was returned to lock down.

Upon admission to Marion-Walthall the third time, on March 3, 2003, plaintiff was placed immediately in lockdown.  Mr. Raiford stated that Ms. Payne told him that the reason plaintiff was in lock down was to protect him from being attacked by gang members.  Defendants have moved to strike this statement as inadmissible hearsay.  However, Rule 801(d)(2) of the Federal Rules of Evidence provides that a statement offered against a party which is the party's own statement, either in an individual or representative capacity, as well as a statement made by a party's "servant concerning a matter within the scope of the...employment" are admissions of a party-opponent and are not hearsay.  Accordingly, defendants' motion to strike this statement is denied.  Similarly, Mr. Raiford avers that when he was admitted to Marion-Walthall he was wearing a black prayer rosary bead, and Ms. Payne told him to give it to her to put with his property, because "guys were jumping on other guys, taking their stuff."  This statement is also admissible under 801(d)(2).[8]

---

them as well.  *See*, *e.g.*, *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996) ("It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony.") (citations omitted); *see also Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 136 n.23 (5th Cir. 1992), *reh'g denied*, 957 F.2d 869 (5th Cir. 1992); *Hebert v. Price Intern*, 2004 WL 414959, at * 2(E.D. La. 2004).

[8] During the week before he was assaulted on March 28, 2003, plaintiff claims that he was threatened twice, once by Mr. Kelly.  This statement is inadmissible hearsay.  Plaintiff also states that a few days after being threatened by Mr. Kelly, two inmates (one of whom was Bernard Carter, an alleged murder, who had been housed in the Zone) attacked a third in the Zone.  According to plaintiff, the victim of this attack had been attacked before by Mr. Carter and

According to Marilyn Payne, a sergeant at Marion-Walthall, during his third period of incarceration plaintiff repeatedly asked her if he could be put in the Zone because he was tired of being in lockdown.  In response, Ms. Payne asked plaintiff if he was sure he was going to be safe in there, and plaintiff assured her that he felt no danger.  Nevertheless, Ms. Payne initially refused plaintiff's requests because of the policy requiring that he be in lockdown.  Ms. Payne had several conferences with the warden, defendant Joe Mingo, about plaintiff's request.  Ultimately, it was decided that plaintiff should be released into the Zone because there was no danger of any harm to him.[9]  Ms. Payne testified that she had no reason to believe that plaintiff

----

had asked for protective custody so he was put in plaintiff's lock down cell and when Mr. Carter was on the yard, this inmate would stay in the lockdown cell.  Plaintiff states that a few days before he was let out of lockdown, this inmate was convicted and transferred to the state side, but within a few days he was beaten again by Carter and another inmate.  The court agrees with defendants that plaintiff has not demonstrated that he has personal knowledge of these matters, and that the statements contain inadmissible hearsay, so defendants' motion to strike these statements is granted.  Plaintiff also states that Mr. Carter, an alleged murderer, and another inmate were brought from the state side and put into plaintiff's cell for five minutes, but then Sergeant Derrick Mingo came running to plaintiff's cell, immediately removed both inmates and asked plaintiff "why did you let them in here?"  Defendants have moved to strike this statement as unauthenticated and as hearsay.  However, the court finds that plaintiff has demonstrated his personal knowledge of this event, as he was present, and the statement by Sergeant Mingo is an admission of a party-opponent so defendants' motion to strike is denied. Plaintiff further states that he had nothing to do with letting them in his cell, and that Sergeant Mingo put plaintiff in another lockdown cell for fifteen or twenty minutes with two other inmates while he relocated Mr. Carter and the other inmate.  These statements are based on plaintiff's personal knowledge so he is competent to testify and the motion to strike that statement is denied.  Plaintiff states that he did not see the attackers in lockdown so he believes they were returned to the state side.  Statements based on belief ,as opposed to personal knowledge, are not competent summary judgment evidence.  *See*, *e.g.*, *Lester*, 757 F.Supp. at 744 n.10.  Accordingly, this statement will be stricken.  Finally, plaintiff states that the victim was taken to the hospital and was eventually housed with plaintiff in lockdown.  This is based on plaintiff's personal knowledge so he is competent to testify and the motion to strike that statement is denied.

[9] According to Charles Abrams, a Captain at Marion-Walthall at the time of plaintiff's assault (and now the warden), an inmate will not be transferred from protective custody to the Zone unless he has requested the transfer.  When such a request is made, an evaluation of the

was in danger and would not have moved him if she thought he was.   Mr. Raiford avers that on

the day plaintiff was released into the Zone, he told Ms. Payne that if anything happened to

plaintiff, "at least [he] would know about it and try to stop it."  In response, Ms. Payne told Mr.

Raiford that she would have to see if Warden Mingo would approve it.  Defendants have moved

to strike Ms. Payne's statement but the court finds it admissible under 801(d)(2).

According to plaintiff, Ms. Payne let him out into the Zone because she said it was too

crowded in lockdown and they needed the space.  Mr. Raiford also avers that he was present

when Ms. Payne told another inmate, in response to a question as to why plaintiff was let out of

lockdown, that they needed more space for lockdown.  Nevertheless, plaintiff has testified that he

preferred this housing assignment and never objected to the move, nor did he ever subsequently

request to go back to protective custody.

Ms. Payne released plaintiff into the Zone on March 25, 2003.  Three days after being

released into the Zone, on March 28, 2003, plaintiff was assaulted by other inmates.  Mr. Raiford

states in his affidavit that on the day of the attack, he saw approximately ten members of the

Vicelords gang huddle up and talk secretly, and as they talked, they were looking in his and

plaintiff's direction.  Mr. Raiford said that because of what the Vicelords were doing, he warned

his uncle to stay close.[10]  Mr. Raiford then took a shower and when he stepped out, he was

---

inmate's safety is done before the request is honored, and that evaluation proceeds up the chain
of command.

[10] Mr. Raiford also avers that while he fixed some food for plaintiff, threats were made
about both of them.  This will be stricken as inadmissible hearsay.  Similarly, Louis McClendon,
another inmate who submitted an affidavit in opposition to the motion for summary judgment,
avers that before the assault, "there had been rumors among the inmates that [redacted] and other
gang members would jump Charles and his relative."  This will also be stricken as inadmissible
hearsay.

attacked by about five inmates.  Plaintiff was then attacked as well by several other inmates.[11]
He was hit several times in the neck and back and was knocked out.   Raiford avers that all of
most of the guys who attacked him and his uncle were involved in the fights that occurred in the
five weeks he had been in the Zone, and they were the same men he had seen huddled together
earlier that day.

 Immediately after the assault, plaintiff was assisted by multiple officers and was
transported to the hospital to receive medical care, along with his nephew.[12]  Subsequently he
remained out on bond until the filing of his complaint in the instant lawsuit.   The six attackers
were arrested and charged with aggravated assault.

Plaintiff has conceded in opposition to the motion for summary judgment that none of the
defendants had any "particularized warning" of the assault, but that plaintiff's case is based on a
theory of pervasive violence.  The evidence regarding that theory is discussed below.

Plaintiff stated in his affidavit that from his lockdown cell, he could hear some inmate
fights through the cell wall.  He states that in the three weeks he was incarcerated the last time,
he heard at least two fights a week.  After most of the fights that he heard, he would see the
injured inmate being brought back to lockdown.  Defendants have moved to strike these
statements regarding fights, on the ground that because plaintiff states in his affidavit that his cell
was the furthest from the Zone (approximately eighty feet) and that "he could not see the Zone

---

[11] According to defendants' records, plaintiff was attacked by six inmates:  Allen Russell,
Jr., Norman Patton, Jr., Derrick Wells, Hollis Nelson and Terrence Nelson.

[12] Mr. Raiford avers that one of the two officers (whose name he does not know but he
thinks his name is Taylor but is called "Tater") who took him and plaintiff to the hospital said
"them boys are getting outrageous with this gang stuff.  It's got to stop."  The court agrees with
defendants that this statement should be stricken as inadmissible hearsay.

nor hear everything that went on," he lacks personal knowledge and is not competent to testify as to these matters. However, the fact that plaintiff could not see the Zone nor hear *everything* that went on does not mean he is not competent to testify as to those things he was able to hear. Accordingly, defendants' motion to strike those statements is denied.

Mr. Raiford stated in his affidavit that during the approximately five weeks before the assault, there were many fights in the Zone, and sometimes there were several a day. Defendants have moved to strike this statement as insufficiently specific; however, the court denies the motion as to that statement. Mr. Raiford also avers that during the weeks before the assault, he could see guards in the tower watch fights between inmates and not intervene, but would wait until the fight was over. Sometimes, the injured inmate would be transferred to the state side and the other inmate would stay in the Zone and not go to lockdown. Mr. McClendon averred that unidentified gang members would huddle up together every other day and that every time they did this they would beat somebody up.

Mr. McClendon averred that Warden Mingo would come to the Zone about once a week.[13] Mr. McClendon states that Ms. Payne would frequently sit and talk with inmates. Mr.

---

[13] Mr. McClendon avers that Warden Mingo's visits to the Zone were "usually about a fight." This is not based on personal knowledge, as Mr. McClendon is speculating as to Warden Mingo's reason for coming to the Zone and therefore it will be stricken. In addition, Mr. McClendon said that during these visits Warden Mingo would say things like "Y'all in these gangs trying to kill each other" and would usually state that they would "be sure to find out who beat who and press charges." Mr. McClendon further avers that Rocky Williams, the Chief Deputy Sheriff, would also come to the Zone and would say things like "if they keep up the beating, next one we catch, we're gonna charge." Although the court finds that these statements are not hearsay and would be admissible under Rule 801(d)(2), there has been no showing that Mr. McClendon had personal knowledge of these statements and that his source is not hearsay. Moreover, as noted above, Mr. McClendon has stated that he was in lockdown at least part of the time he was at Marion-Walthall so it is unclear whether and to what extent he has any personal knowledge of what was going on in the Zone. Accordingly, these statements will be stricken.

McClendon states that when Ms. Payne would take inmates to the yard, the inmates (including himself) would pass by plaintiff's lockdown cell and would yell "Nigger, you better stay in there" and would made all kinds of threats.  Defendants have moved to strike this statement as hearsay; however, it is being offered not for its truth, but to show notice to Ms. Payne of the threats, so it is admissible for that purpose only.[14]

The defendants and other employees of Marion-Walthall have denied the level of violence posited by plaintiff.  Warden Mingo testified that inmate-on-inmate violence at Marion-Walthall was very rare, although there were "scuffles."  Indeed, Warden Mingo testified that plaintiff was the only inmate injured in a violent incident in 2002 or 2003.   According to Charles Abrams, an officer at Marion-Walthall during the relevant time period (and the current warden), it never came to his attention that there was a problem of gang violence or even just regular inmate-on-inmate violence on the county side at Marion-Walthall.  Similarly, Ms. Payne testified that she was not aware of any other inmate-upon-inmate assault, other than upon plaintiff, after she became sergeant (either at the end of 2002 or early 2003).  Ms. Payne testified that she was not aware that there were gang members present in the jail.  As discussed earlier, Ms. Payne testified that she did not perceive that there was any danger to plaintiff, which is why she and the warden ultimately decided to release him from lockdown.  Cora Allen, another sergeant at Marion-Walthall during the relevant time period, testified that she was not aware during the first quarter of 2003 that plaintiff was in any danger of being assaulted by other inmates.  Ms. Allen

---

[14] Mr. McClendon has also stated that Ms. Payne "would have heard these threats."  This is clearly not admissible as it is based on Mr. McClendon's belief as to what Ms. Payne would have heard.  In addition, Mr. McClendon states that these same inmates would also stop by plaintiff's cell regularly and make threats.  This will be stricken as inadmissible hearsay, as it is being offered for its truth.

also testified that prior to 2003, plaintiff's assault was the first inmate-on-inmate violence she was aware of. Sheriff Stringer testified that he did not have major concerns about inmate-on-inmate violence at Marion-Walthall from 2002 forward, but that he only had minor concerns because "[i]t's always a concern about anybody getting into a fight."

Derek Mingo, a Sergeant at Marion-Walthall (and the son of Warden Mingo), testified that all physical incidents between prisoners would be in incident reports and tower logs. James Miller, the Tower 3 Operator, said that any fight that he recorded was in the Unit Register - and he did not think that there were any fights before the one where plaintiff was attacked. Defendants produced incident reports of inmate-upon-inmate assaults in the Zone occurring in the one year period prior to the assault on plaintiff. These reports show that there were six inmate-upon-inmate physical altercations in the Zone during that period.[15]

As part of their training, prison officers at Marion-Walthall attended a mandatory class on gang violence. During this training, officers learned how to recognize gang members, such as gang symbols and signs, observing their movements, and to notice whether more than three were together in a crowd (which means that they were having a meeting and should be watched). It is undisputed that Marion-Walthall has no system in place for identifying the gang affiliations of incoming prisoners on the county side, unlike on the state side where there is such a system. Derek Mingo, Warden Mingo and Mr. Abrams all explained that such a system would not be

---

[15] The Unit Register was not produced by defendants during discovery and defendants have indicated that it is unavailable and was presumably destroyed in Hurricane Katrina. Plaintiff argues that defendants did not write up all the assaults, but that the affidavits of the inmates show there were 35-40 inmates in the Zone, and several assaults per week. From that, plaintiff extrapolates - assuming there were two assaults per week (8 per month) - the per capita assault rate in the Zone was 20%.

feasible because generally speaking, inmates are constantly coming and going and are only staying for short periods of time.

Warden Mingo testified that they did not expect any type of gang violence on the county side. Similarly, John Anderson, another officer at Marion-Walthall, testified that he never saw indications of gang members on the county side and never heard inmates on the county side discuss gang membership. Mr. Anderson never heard rumors that plaintiff's attackers were gang members. Mr. Miller testified that prior to the assault on plaintiff, he was not aware of any gang violence that occurred. Derek Mingo testified that there is no greater risk of violence to other inmates from gang members than from other inmates.

Mr. Raiford has stated that he could see and hear the inmate booking process in 2002, and when inmates were booked, no rules were announced. Mr. Raiford avers that he never saw written disciplinary rules and he never saw an inmate go to a disciplinary hearing. Defendants have moved to strike these statements as lacking personal knowledge; however, the court finds that Mr. Raiford is competent to testify to these matters (although, as discussed below, these statements have very limited probative value) so the motion to strike them is denied. According to Mr. McClendon, inmates smoked marijuana every day and drank alcohol in the Zone. The court will allow this statement to be considered on the motion for summary judgment; however, the court notes that it has limited probative value, as it is not clear how Mr. McClendon has personal knowledge of this information, and he elsewhere averred that he was in lockdown at least part of the time he was at Marion-Walthall. Mr. Raiford avers that while he was at Marion-Walthall with plaintiff, Ms. Payne would walk in the yard with inmates who were not wearing

shirts, and that these inmates had gang tattoos on their arms, chests and sometimes their backs.[16]

Federal Claims[17]

It is well-established that prison officials have a duty to protect prisoners from violence at the hands of other prisoners.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (collecting cases).  However, "[i]t is not...every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  *Id.*  In *Farmer*, the Supreme Court articulated the standard that applies to an inmate's claim based on a failure to protect theory.  First, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  *Id.* at 834 (citations omitted).  Second, the prison officials must have acted or failed to act with "'deliberate indifference to inmate health or safety.'"  *Id.* (citations omitted).   In this context, "deliberate indifference" means that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.  The court explained that the reason for requiring subjective consciousness of risk is that "[t]he Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual punishments," and therefore, while "an official's failure to alleviate a significant risk that he should have perceived but did

---

[16]  Mr. McClendon also avers that Ms. Payne has watched inmates shower.  This is a conclusory statement about another person's actions of which the affiant did not demonstrate personal knowledge.  In addition, the statement lacks specificity as to who and when.  Accordingly, it will be stricken.

[17] In his complaint, plaintiff does not explicitly delineate what the alleged constitutional violations are, or under which procedural vehicle he purports to bring his federal claims; the complaint simply alleges a failure to protect.  In response to the motion for summary judgment, plaintiff clarifies that his claim is brought pursuant to 42 U.S.C. § 1983.

not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* [18]

Finally, even prison officials who actually knew of a substantial risk to inmate safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. *Id.* at 844. This is because "[a] prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,'...a standard that incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Id.* at 844-45 (citations and internal citations omitted).

Plaintiff has conceded that neither he nor defendants had particularized warning that he was going to be attacked, but states that his case is based on a theory of "pervasive violence." Plaintiff argues that there were essentially no rules at Marion-Walthall and that the facility's practice and custom was to openly tolerate violence among inmates. It is true, as plaintiff argues, that he need not prove that the prison official knew that he "was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Id.* at 843. Indeed, for purposes of determining whether prison officials, acting with deliberate indifference, exposed a prisoner to a substantial risk of serious harm, "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* Along

---

[18] The constitutional rights of a convicted state prisoner spring from the Eighth Amendment's prohibition on cruel and inhuman punishment, while those of a pretrial detainee derive from the procedural and substantive due process guarantees of the Fourteenth Amendment. *Hare v. Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (citations omitted). Regardless, the Fifth Circuit has made it clear that the subjective deliberate indifference standard applies to pre-trial detainees as well as to convicted prisoners. *See id.* at 643-45, 647-48, 650.

these lines, deliberate indifference has been found in prison situations "where terror reigns" and courts have held that failure to control or segregate prisoners who pose a danger to the physical safety of other prisoners can constitute cruel and unusual punishment.  *See*, *e.g.*, *Alberti* v. *Klevenhagen*, 790 F.2d 1220, 1226 (5ᵗʰ Cir. 1986), *reh'g denied*, 799 F.2d 1220 (5ᵗʰ Cir. 1986); *Stokes v. Delcambre*, 710 F.2d 1120, 1124-25(5ᵗʰ Cir. 1983); *Jones v. Diamond*, 636 F.2d 1364, 1373-74 (5ᵗʰ Cir. 1981).

<u>Defendants in Their Individual Capacities</u>

Defendants have asserted the defense of qualified immunity with respect to plaintiff's claims against them in their individual capacities.  "Qualified immunity provides government officials performing discretionary functions with a shield against civil damages liability, so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  *Gobert v. Caldwell*, 463 F.3d 339, 345 (5ᵗʰ Cir. 2006) (citation omitted).  This doctrine "protects all public officers from individual liability except those 'who are plainly incompetent or who knowingly violate the law.'"  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Accordingly, an official is not entitled to qualified immunity only where: 1) plaintiff has demonstrated a violation of a clearly established federal constitutional or statutory right and 2) the official's actions violated that right to the extent that an objectively reasonable person would have known.  *Id.*  (citations omitted).   A right is considered clearly established when the contours of the right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Lester*, 757 F.Supp. at 747 (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  A party seeking damages from an official asserting qualified immunity bears the burden of overcoming that defense.  *Gobert*, 463 F.3d at 346 n.14.

18

<u>Marilyn Payne</u>

The undisputed evidence establishes that Ms. Payne was not aware of any threat of physical violence to plaintiff at the time she released him into the Zone.  Indeed, plaintiff has conceded that none of the defendants had knowledge of any particular danger to him before he was assaulted.  Although there is some conflicting evidence in the record as to why plaintiff was released into the Zone, the undisputed evidence establishes that Ms. Payne consulted with Warden Mingo several times and spent a good deal of time considering plaintiff's safety before finally moving him into the Zone.  Indeed, plaintiff himself was glad to be out of lockdown and did not perceive that there was any threat to his safety by moving into the Zone.  Moreover, Ms. Payne testified that she was not aware of any other inmate-upon-inmate assault, other than upon plaintiff, after she became sergeant (either at the end of 2002 or early 2003) and she testified that she was not aware that there were gang members present in the jail.  Although some of the facts set forth in the inmate affidavits raise a question of whether Ms. Payne should have known about the presence of gang members in Marion-Walthall, they do not establish that she did, in fact, possess subjective knowledge of any substantial risk to plaintiff's safety and that they deliberately disregarded that risk. And although Mr. Raiford avers that Ms. Payne told him that the reason she had put plaintiff in lockdown was to protect him from gang members, the undisputed evidence establishes that she evaluated plaintiff's safety before releasing him into the zone.

Accordingly, the court finds that Ms. Payne is protected by qualified immunity and is therefore entitled to summary judgment on plaintiff's federal claims against her in her individual capacity.

Richard Stringer

"To state a cause of action under § 1983, the plaintiff must allege facts reflecting the defendants' participation in the alleged wrong, specifying the personal involvement of each defendant." *Jolly v. Klein*, 923 F.Supp. 931, 943 (S.D. Tex. 1996) (*citing Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992)).  Further, "[u]nder § 1983, supervisory officials cannot be held liable for the actions of subordinates under any theory of vicarious liability."  *Id.* (citations omitted).  Thus, a supervisor may only be liable where he is either personally involved in the constitutional violation, or there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.  *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) (citation omitted); *see also Clark v. McMillin*, 932 F.Supp. 789, 790 (S.D. Miss. 1996) (in order to prevail on claim against sheriff in his individual capacity, plaintiff "must show that he affirmatively participated in acts that resulted in the alleged constitutional deprivation, or that he implemented unconstitutional policies that causally resulted in" injury).  Supervisory liability can exist without personal participation by an official only where the official "implement[s] a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Thompson*, 828 F.2d at 304 (citations omitted).

Plaintiff testified that while at Marion-Walthall, Sheriff Stringer never came to the facility that he knew of, and he never spoke with Stringer personally.  Plaintiff has also conceded that none of the defendants had particular knowledge of any threat of violence to him.  Plaintiff has not alleged that Sheriff Stringer was personally involved in the alleged constitutional deprivation. Sheriff Stringer testified that he did not have major concerns about inmate-on-inmate violence at Marion-Walthall from 2002 forward and that he did not maintain a file on gang violence at

Marion-Walthall.   There is simply no evidence that Sheriff Stringer had any actual knowledge of a substantial risk of serious harm to plaintiff.  *See Clark*, 932 F.Supp. at 793.[19]  Thus, the only way Sheriff Stringer can be liable under Section 1983 is if he implemented an unconstitutional policy that caused plaintiff's injury.  *Id.*

It is not disputed in this case that Sheriff Stringer had policymaking authority; as defendant notes in its motion for summary judgment, during the relevant time period "Sheriff Richard Stringer was the final policymaker for Marion County in relation to activities of the Sheriff's Department and the county pre-trial unit of the Marion-Walthall Correctional Facility."

It is less than clear exactly what policy or lack of policy plaintiff alleges caused his injuries.  As defendants note in their motion for summary judgment, no such policy (or theory of recovery) is identified in plaintiff's complaint.  In opposition to the motion for summary judgment, plaintiff states:

> There was pervasive violence at the MWCF - gang
> membership was open and gang fights were occurring
> as many as several times a day.  No rules were announced
> to incoming gang members, no rules were enforced after they
> were booked, and no discipline or prosecution was made of
> inmates who engaged in violence.  Violence was encouraged by
> the permitted use of alcohol and marijuana and openly tolerated
> with little effort made to stop it.  This was a matter of practice
> and custom that must have been set by Stringer and Mingo
> such that they are liable in their official capacities.  No rules

---

[19] Plaintiff has put forth evidence (in the form of inmate affidavits) showing that there may well have been more assaults at Marion-Walthall than in the records produced by defendant. Plaintiff has also put forth evidence showing that there were gang members present at Marion-Walthall and suggesting that prison employees would have seen their gang symbols and signs and would have therefore been aware of their presence.  However, this does not establish actual knowledge on Sheriff Stringer's part.  At most, it could establish knowledge on the part on Sheriff Stringer's subordinates - but for the purposes of section 1983 liability, "constructive knowledge will not suffice."  *Clark*, 932 F.Supp. at 793.

existed at the MWCF and none were applied even in the face
of rising violence.  Mingo and Stringer's Chief Deputy, Rocky
Williams, regularly made empty threats to prosecute for assault,
but never did.  And Mingo abdicated his responsibility for the
zone, claiming it was Williams' (the Sheriff's) responsibility.
Finally, according to now warden Abrams, it was the inmate's
decision whether to come out of protective custody.  These
practices and customs, if not policies, were 'so pervasive...as to
be the functional equivalent of a policy adopted by the final
policymaker,' in this case, Stringer.

First, the evidence does not support plaintiff's allegation that there was "pervasive gang

violence" at Marion-Walthall and that gang fights were occurring several times a day.  Indeed,

there is no evidence that the alleged violence occurring at Marion-Walthall (if even as frequent as

alleged by plaintiff) was gang-related.  There is also nothing in the evidence to support the

assertion that there was "rising violence" at Marion-Walthall.   As for the allegation that "no

rules" were announced to incoming gang members or were enforced after they were booked, this

statement is apparently based on Mr. Raiford's statement in his affidavit that he could see and

hear the inmate booking process in 2002, and when inmates were booked, no rules were

announced, and that he never saw written disciplinary rules and never saw an inmate go to a

disciplinary hearing.  However, Mr. Raiford could not have (and does not allege to have) seen

every inmate who was booked at Marion-Walthall.  Moreover, the fact that Mr. Raiford did not

hear any rules being announced, nor saw any written rules himself, does not mean that there

were, in fact, no rules in place.  Nor, of course, does the fact that Mr. Raiford never "saw" an

inmate go to a disciplinary hearing mean that there were no disciplinary hearings.   As for the

allegation that inmates who engaged in violence were not prosecuted, plaintiff has submitted no

evidence whatsoever to support this allegation.  Indeed, it is belied by the evidence in the record

showing defendants' attempt to prosecute plaintiff's attackers.  As for the allegation that violence

was encouraged by the permitted use of alcohol and marijuana, this is based on Mr. McClendon's assertion that inmates smoked marijuana every day and drank alcohol in the Zone.  This statement is of limited probative value because it is not clear how Mr. McClendon has personal knowledge of this information, and Mr. McClendon elsewhere averred that he was in lockdown at least part of the time he was at Marion-Walthall.  Moreover, there is no evidence that any of the violence that occurred was related to alcohol or marijuana use.  And more importantly, there is no evidence that defendants were allowing inmates to use alcohol and marijuana.  The allegation that Warden Mingo abdicated his responsibility for the Zone, claiming that it was Sheriff Williams' responsibility, is unsupported by any admissible evidence.[20]  Finally, plaintiff's statement that according to Mr. Abrams, it was an inmate's decision whether to come out of the Zone, is true; however, Mr. Abrams (and others) also testified that before an inmate would be released into the Zone, an evaluation would be done of his safety, which would proceed up the chain of command, and no inmate would be released into the Zone if he were deemed to be in any danger.

The best argument plaintiff could make in support of his policy claim is one that he raised during depositions and mentioned briefly in the facts section of his opposition to the motion for summary judgment, but did not explicitly raise in the argument section of his brief:  the lack of screening for gang affiliation of incoming inmates on the county side at Marion-Walthall.  However, even this argument would ultimately fail, as plaintiff has not presented evidence that the defendants knew, before he was attacked, that the inmates who assaulted him belonged to a

---

[20] The only evidence to support this allegation is contained in the Jackson affidavit, which was previously struck by this court.

particular gang that posed a threat to him, nor has he demonstrated that there were other inmates in the Zone known to prison officials as members of that gang who might pose a threat to him. *See Lewis v. Richards*, 107 F.3d 549, 554 (7th Cir. 1997) (holding that in the absence of such evidence, plaintiff "failed to convince [the court] of anything except that the procedures at the [prison] leave something to be desired when attempting to screen out predatory gang members, resulting in egregious lapses in security at the prison.  Obviously this reflects very poorly on the defendants, but it certainly falls short of being sufficient to maintain a claim under the Eighth Amendment.") (citation omitted).

There is simply no evidence that Sheriff Stringer implemented an unconstitutional policy or unconstitutionally failed to implement a policy, and there is no evidence to support a finding that Sheriff's Stringer's actions or failure to act violated plaintiff's rights to the extent that an objectively reasonable person would have known.  Accordingly, Sheriff Stringer is protected by qualified immunity and is therefore entitled to summary judgment on plaintiff's federal claims against him in his individual capacity.

Joe Mingo

As the warden of Marion-Walthall, Warden Mingo is a supervisory official and therefore the same analysis for Sheriff Stringer applies to Warden Mingo:  he may only be liable if he was personally involved in the constitutional violation, or if there is a sufficient causal connection between his wrongful conduct and the constitutional violation.  *Thompkins*, 828 F.2d at 304 (citation omitted); *see also Clark*, 932 F.Supp. at 790.

Again, as discussed above, plaintiff has admitted that none of the defendants had specific knowledge of a threat to him.  In addition, plaintiff testified that he only spoke to Warden Mingo

24

once, regarding a funeral he wanted to attend.  Warden Mingo testified that he did not expect

gang violence on the county side of Marion-Walthall at the time in question, and that inmate-

upon-inmate violence was very rare during 2002 and 2003, although there were "scuffles"

occasionally.  He testified that plaintiff was the only inmate injured in a violent incident in 2002

or 2003.

Accordingly, in order to succeed on claim against Warden Mingo, as with Sheriff

Stringer, plaintiff must show that he implemented an unconstitutional policy or lack of policy.

*Thompson*, 828 F.2d at 304.   Assuming that Warden Mingo could be considered a policymaker,

however, as discussed above, there is no evidence of any unconstitutional policy that caused

plaintiff's injuries.  Accordingly, Warden Mingo is entitled to qualified immunity and is

therefore entitled to summary judgment on plaintiff's federal claims against him in his individual

capacity.

<u>Defendants in Their Official Capacities</u>

"For purposes of liability, a suit against a public official in his official capacity is in effect

a suit against the local government entity he represents."  *Mairena v. Foti*, 816 F.2d 1061, 1064

(5th Cir. 1987) (citations omitted).  The Supreme Court has held that in order to hold a local

governmental entity liable under section 1983, plaintiff must prove that a policy, custom or

practice of the local government entity was the "moving force" behind the constitutional

violation.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *see also Grabowski v.*

*Jackson Cty. Public Defenders Office*, 79 F.3d 478, 479 (5th Cir. 1996) ("A municipality or

county can be held accountable to a pretrial detainee for a due process violation resulting from an

employee's acts only if the harmful acts resulted from a policy or custom 'adopted or maintained

with objective deliberate indifference to the detainee's constitutional rights.'") (citations omitted).

In the absence of an official policy adopted and promulgated by an official with policy-making authority (which plaintiff does not allege in this case), the Fifth Circuit has defined a policy as "a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Lester*, 757 F.Supp. at 745 (*quoting Webster v. Houston*, 735 F.2d 838, 841 (5th Cir. 1984)). *See also Clark*, 932 F.Supp. at 794 (A policy can arise from practices and customs "so pervasive,...as to be the functional equivalent of a policy adopted by the final policymaker." ). In order to impose official liability pursuant to such a policy, "[a]ctual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had designated policy-making authority." *Lester*, 757 F.Supp. at 745 (*quoting Webster*, 735 F.2d at 841).

This court has already concluded that plaintiff's claims against defendants fail both for lack of proof that they were deliberately indifferent to a substantial risk of serious harm to plaintiff and for lack of proof that plaintiff's injuries resulted from any policy or custom implemented by any policymakers. Consequently, there exists no basis for imposing liability against defendants in their official capacities. *See Clark*, 932 F.Supp. at 794.

State Law Claims[21]

Defendants in Their Individual Capacities

_____

[21] Plaintiff has also asserted unspecified state law claims against defendants in his complaint. In opposition to the motion for summary judgment, plaintiff explained that his state law claims were brought pursuant to the Mississippi Tort Claims Act ("MTCA").

Mississippi Code Annotated section 11-46-7(2) provides that "no employee [of a governmental entity] shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties."  That subsection goes on to state that "an employee shall not be considered as acting within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander , defamation or any criminal offense."  Subsection (7) then provides that "it shall be a rebuttable presumption that any act or omission of an employee within the time and at the place of his employment is within the course and scope of his employment."

The allegations in plaintiff's complaint (and the evidence adduced by the parties on the instant motion for summary judgment) is that the acts and omissions complained of occurred in the course and scope of the defendants' employment with either Marion-Walthall or the County. There has been no evidence presented by plaintiff to rebut that presumption, nor is there proof of fraud, malice,[22] libel, slander, defamation or any criminal offense.  Accordingly, defendants are entitled to immunity on plaintiff's state law claims against them in their individual capacities.

Defendants in Their Official Capacities

Mississippi Code Annotated section 11-46-7(2) provides that "[a]n employee may be joined in an action against a governmental entity in a representative capacity if the act or

---

[22] "Malice" has been defined by the Mississippi Supreme Court as "an objective state of mind which may be inferred if the plaintiff demonstrates that the defendant acted with ruthless or reckless disregard for the plaintiff's rights."  *Moore v. Carroll Cty.*, 960 F.Supp. 1084, 1091 (N.D. Miss. 1997) (collecting cases).  As this court has already disposed of plaintiff's section 1983 claims of deliberate indifference, *supra*, there is no basis to conclude that any of the defendants' conduct constituted malice.

omission complained of is one for which the governmental entity may be liable."   In section11-46-5, the state has waived its sovereign immunity for certain tort claims.  However, in section 11-46-9, certain exceptions are enumerated.  In section 11-46-9(1)(d), governmental entities are exempted from liability for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused."

The essence of plaintiff's claim is that defendants implemented unconstitutional practices and policies and/or unconstitutionally failed to implement practices and policies regarding inmate safety and protection.  The court finds that such a claim is based upon the exercise or failure to exercise a discretionary function and therefore defendants are entitled to immunity.  *See*, *e.g.*, *McQueen v. Williams*, 587 So. 2d 918, 922 (Miss. 1991) (a sheriff's duties with respect to operating a jail and keeping prisoners confined were discretionary in nature and therefore sheriff entitled to qualified immunity in suit to recover for wrongful death of victim murdered by escaped inmates).

In addition, section 11-46-9(1)(m) exempts claims by anyone who "is an inmate of any detention center, jail, workhouse, penal farm, penitentiary or other such institution, regardless of whether such claimant is or is not an inmate" at the time the claim is filed.  A pre-trial detainee is an inmate within the meaning of this exemption.  *See Liggans v. Coahoma Cty. Sheriff's Dep't*, 823 So. 2d 1152, 1155 (Miss. 2002) (holding that incarcerated arrestee is inmate within the meaning of MTCA); *Harvison v. Greene Cty. Sheriff Dep't*, 899 So. 2d 922 (Miss. Ct. App. 2005) (dismissing under section 11-46-9(1)(m) pre-trial detainee's state law tort claims).

Accordingly, under either section of the MTCA, plaintiff's state law claims against

28

defendants in their official capacities must be dismissed.

IT IS, THEREFORE, ORDERED AND ADJUDGED that defendants' motion for summary judgment [ **# 112** ] is granted.  Plaintiff's complaint is dismissed with prejudice.

IT IS FURTHER ORDERED AND ADJUDGED that all other pending motions are dismissed as moot.

SO ORDERED and ADJUDGED on this, the 10th day of April, 2007.


*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE